# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Andre Clarke, | : | |
| Petitioner | : | |
| | : | |
| v. | : | No. 508 C.D. 2024 |
| | : | Submitted: December 9, 2024 |
| City of Philadelphia (Workers' | : | |
| Compensation Appeal Board), | : | |
| Respondent | : | |

BEFORE:    HONORABLE RENÉE COHN JUBELIRER, President Judge
HONORABLE CHRISTINE FIZZANO CANNON, Judge (P.)
HONORABLE MARY HANNAH LEAVITT, Senior Judge

OPINION NOT REPORTED

MEMORANDUM OPINION BY
PRESIDENT JUDGE COHN JUBELIRER          FILED:  January 17, 2025

Andre Clark (Claimant) petitions for review of the Order of the Workers' Compensation Appeal Board (Board) that affirmed a Workers' Compensation Judge's (WCJ) denial of the Petition to Reinstate Benefits (Reinstatement Petition) and Petition for Penalties (Penalty Petition) (together, Petitions).  Through the Petitions, Claimant sought to establish that the City of Philadelphia (Employer) had accepted his COVID-19 (COVID) diagnosis, and subsequent "long-haul" symptoms, as work related through its payment of compensation in lieu of workers' compensation (WC), was estopped from denying the work relatedness of those conditions, and when it did so through the issuance of an untimely Notice of Compensation Denial (NCD), it violated the Workers' Compensation Act (Act).[1]

---

[1] Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. §§ 1-1041.4, 2501-2710.

Crediting Employer's witnesses that the payments made prior to the NCD were not intended to be made in lieu of WC and that Claimant did not otherwise meet his burden of proving an entitlement to WC benefits, the WCJ denied the Petitions. Claimant argues on appeal that the WCJ and Board misapplied the law and departed from the Act's humanitarian purpose. Upon review, we are constrained to affirm because the WCJ's Decision is supported by substantial, competent, and credible evidence, and there was no misapplication of the Act or precedent.

## I. BACKGROUND

### A. *Employer's NCD and the Petitions*

Claimant worked as a police officer for the City. In December 2020, he was diagnosed with COVID and pneumonia and was hospitalized for those conditions for several days. Claimant did not return to his position, and his time off of work from December 2020 until March 2022 was designated as "E-time" or Act 17[2] leave. Claimant received his regular pay, was not required to use his sick or vacation time, and continued to accrue sick and vacation time. After March 2022, Employer required Claimant to use his vacation and sick time for his continued time out of work.

Employer issued an NCD on January 24, 2022, denying liability for any alleged December 21, 2020 injury Claimant asserted arising from work-related exposure to COVID. The NCD indicated Claimant had given notice of his alleged exposure to COVID on December 21, 2020, but Employer denied that the exposure, or related injury, were work related. Claimant filed the Petitions on July 30, 2022,

---

[2] Act of April 29, 2020, P.L. 118, No. 17. Pursuant to Section 57A02 of Act 17, certain individuals, including police officers, who contract or are diagnosed with COVID or have to quarantine due to exposure to COVID, and who are temporarily incapacitated from performing their duties, are entitled to be compensated for up to 60 days. 35 Pa.C.S. § 57A02.

averring that he sustained a work-related injury of which Employer had notice of as of December 21, 2020, and that Employer had violated the Act by "unilaterally terminating wages in lieu of compensation without properly filing an NCD." (Certified Record (C.R.) at Item 3.) Employer filed timely responses, denying the material allegations, and the Petitions were assigned to the WCJ.

### B. Proceedings Before the WCJ

#### 1. Claimant's Evidence

Claimant testified[3] and presented documentary evidence about how he was paid by Employer beginning December 21, 2020,[4] the City's evolving COVID policies, and a text chain he had with his direct supervisor, Sergeant Vincent Dayton (Sergeant Dayton). Claimant described being diagnosed with COVID and pneumonia in December 2020, his five-day hospitalization for the same, and his subsequent development of memory loss, dizziness, brain fog, headaches, and heart and breathing issues, for which he was under the care of numerous physicians. (WCJ's Decision, Finding of Fact (FOF) ¶ 2b, 2d.) Claimant remains off work due to headaches and memory issues, and he was paid for E-time or Act 17 benefits until March 6, 2022, after which he had to use accrued sick and vacation time.

Claimant indicated that as part of his work duties, he was around individuals who did not mask and that he had been twice quarantined due to COVID exposure, each time being paid his normal rate of pay. On or about December 23, 2020, he contacted Sergeant Dayton by text and was advised that others with whom he worked

---

[3] Claimant's testimony is found at pages 170a to 208a of the Reproduced Record and is summarized by the WCJ in Finding of Fact 2.

[4] Claimant's Daily Activity Report (DAR), as summarized by the WCJ, lists Claimant's name and reflects that his time was "coded as 'E' from December 22, 2020[,] through December 31, 2021." (WCJ's Decision, Finding of Fact (FOF) ¶ 4.)

3

had been diagnosed with COVID before him. Claimant did not recall telling Sergeant Dayton that he developed COVID at work "using those words," but he believed he had done so, as was reflected in the text in which he asked how many "of us" had tested positive after a holiday party. (*Id.* ¶ 2e.) Claimant acknowledged he was aware of Employer's injured-on-duty (IOD) system because he had previously sustained work injuries, he did not specifically ask for IOD in this instance, and he was never advised to see an IOD doctor after reporting being diagnosed with COVID. (*Id.* ¶ 2h, 2i.)

The WCJ summarized the relevant portions of the texts between Claimant and Sergeant Dayton as follows:

> [] On December 21, 2020, Sergeant Dayton advised Claimant that another officer, "Ralph," developed COVID symptoms. Claimant stated that he would get tested[,] and Sergeant Dayton advised that Claimant would be put on the quarantine list.
>
> [] On December 24, 2020, after advising Sergeant Dayton that he was in the hospital due to COVID[,] Claimant asked, "since that holiday meal how many of us got sick." Sergeant Dayton informed him that six people had tested positive.

(FOF ¶ 3.)

### 2. Employer's Evidence

Employer offered the testimony of Barry Scott, its Deputy Finance Director for Risk Management (Risk Management) and Risk Manager (Mr. Scott), Lieutenant Donald Lowenthal, the Philadelphia Police Department's (Department) Infection Control Officer (Lieutenant Lowenthal), and Sergeant Dayton.

Mr. Scott testified[5] that Risk Management administers Employer's disability programs, including those for work-related injuries and illnesses, although Employer's third-party administrator (TPA) makes compensability determinations regarding claims of work-related injuries. To file a work-related claim for benefits, Mr. Scott indicated that the employee reports the injury to their supervisor, the supervisor fills out a City of Philadelphia Accident, Injury, Illness Form (COPA-II), the supervisor and the TPA investigate the alleged injury, and the TPA determines if the claim is compensable and advises the employee of the results of the investigation. According to Mr. Scott, there was no specific policy precluding police officers from advising their supervisors that they contracted COVID at work or for making a claim by filing a COPA-II. Mr. Scott explained that E-time means "excused time that is 'a time keeping tool that . . . enables an employee to continue to receive their salary when they can't or they're not at work for whatever reason.'" (FOF ¶ 3*e.) Per Mr. Scott, E-time was not an acknowledgement of a work-related condition from Risk Management's perspective, but an administrative timekeeping category, and was used for "folks who succumb to this condition[, COVID,] were not . . . financially penalized by the condition." (*Id.*) Mr. Scott indicated that following federal legislation precluding paid COVID sick leave for police officers, the Pennsylvania legislature enacted Act 17 in April 2020, which mandated 60 days of sick leave for police officers and others, but E-time offered longer periods of paid leave, but was not IOD, WC, or any other benefit. Mr. Scott stated that it became known to Employer in January 2022 that there were several police officers with long-

<hr />

[5] Mr. Scott's deposition testimony is found at pages 3a to 14a of the Reproduced Record and is summarized in a second Finding of Fact 3, reflecting a misnumbering of the Findings of Fact in the WCJ's Decision. For ease of review, any duplicative findings will be marked with the number given followed by an asterisk, for example FOF ¶ 3*.

haul COVID who were still out of work and still receiving E-time, the TPA issued NCDs to those officers, those officers were changed to Act 17 benefits for 60 days, and then they had to use their sick leave. It was after this change that many of these police officers filed for WC benefits even though they had not made prior claims for IOD benefits.

Mr. Scott acknowledged he was not a Department employee but had participated in discussions with the Department about COVID risks at work, and he had not reviewed some of the COVID policies for the Department, including a July 2022 policy advising that a COPA-II should be used for a claim that an officer developed COVID at work. He had no role in directing Department supervisors as to how to respond when an officer reported that the officer contracted COVID at work. Ultimately, Mr. Scott did not characterize E-time as being related to an employee's disability but reflects "an administrative continuation of wages for whatever reason [Employer] or Department deems to provide wage continuation." (FOF ¶ 3*l.) E-time was used for the COVID pandemic as a way to keep employees on the payroll and to account for time those employees were not working.

Lieutenant Lowenthal described[6] the various COVID policies implemented by Employer beginning in March 2020, which he did not write, but interpreted and about which he answered questions. When asked by Department supervisors how to report an employee who was out with COVID on the Daily Activity Report (DAR), Lieutenant Lowenthal indicated that the policies provided that those employees should be listed as being on E-time, regardless of whether the COVID was the result of work or non-work-related COVID exposure. If he was asked whether to complete a COPA-II for an employee who claimed to have contracted

---

[6] Lieutenant Lowenthal's deposition testimony is found at pages 26a to 36a of the Reproduced Record and is summarized in Finding of Fact 4*.

6

COVID from work, he would have advised the supervisor to do so. Lieutenant Lowenthal acknowledged that the first time a policy indicated that a COPA-II should be completed under those circumstances was in July 2022. According to Lieutenant Lowenthal, none of the officers with pending litigation, like Claimant, seeking benefits for work-related COVID had completed the requisite forms for IOD benefits.

Sergeant Dayton testified[7] that if an officer is injured at work, they are to advise their direct supervisor, who would then complete a COPA-II. Sergeant Dayton indicated Employer did not provide any directions or written instructions about whether to complete that form for COVID cases, although he was unsure whether a COPA-II would be completed for COVID. He did not recall Claimant asking him to complete a COPA-II, and although a large number of his squad had COVID around the same time as Claimant, including Claimant's partner, he did not recall any of them reporting that they had contracted COVID at work. The holiday gathering referenced in Claimant's texts, Sergeant Dayton stated, was a Christmas potluck with the squad, and he was not sure that all six people he said tested positive for COVID had been at the potluck.

### 3. The WCJ's Decision

The WCJ found Claimant credible that he contracted COVID, was hospitalized, and did not ask for IOD benefits because he believed that it was protocol to be placed on E-Time for COVID time off. The WCJ "note[d] there is no dispute as to the type of benefits that Claimant was paid and the reason that Claimant received these benefits." (FOF ¶ 10.) The WCJ credited the DAR as evidence that

---

[7] Sergeant Dayton's testimony is found at pages 217a to 245a of the Reproduced Record and is summarized in Finding of Fact 5.

7

Claimant was paid his full salary for this period and such time was coded E-time and did not indicate that this "salary continuation was an admission of liability for [WC] purposes." (*Id.* ¶ 11.) The WCJ accepted Lieutenant Lowenthal's testimony that he instructed supervisors to use E-time "for all COVID-related absences regardless of cause." (*Id.* ¶ 13.) The WCJ found that the NCD, which Claimant argued, reflected Employer's admission that it had notice of a December 21, 2020 work-related injury, was ambiguous because that date could have also indicated the date of Claimant's alleged disability. (*Id.* ¶ 14.)

As for Mr. Scott, the WCJ found

> th[at] testimony . . . credible [and] that, from a risk management perspective, the intention of E-time was to insure [sic] employees who had COVID were not financially penalized by the condition. This [WCJ] finds the testimony that E-time was not a disability benefit credible for the following reasons: it was not administered by [the TPA] who administers all disability payments for Employer. In addition, federal legislation did not provide for paid COVID sick leave for police officers and without E-time there would have been no mechanism to pay officers who had COVID. It is reasonable that Employer used an administrative code for the payment of such lost time. Mr. Scott credibly testified that in January of 2022, he first learned that officers with long-haul COVID remained out of work receiving E-time and that, upon further investigation, none of these officers had filed a COPA[-]II or requested IOD benefits. His testimony is consistent with the documentary evidence of record.

(*Id.* ¶ 12.)

Based on these credibility determinations, the WCJ found

> that the payment of E-time was not payment of wages in lieu of compensation; rather it was an administrative code used by Employer to address illness related to absences due to an unprecedented global pandemic. The mere receipt of payments does not equate to a finding that such payments are wages in lieu of compensation. The intent of the payment is what is relevant. Mr. Scott and Lieutenant Lowenthal

8

credibly testified that these were not disability payments, but rather payments for COVID-related absences.

(*Id.* ¶ 15.) Therefore, the WCJ found that Claimant did not meet his burden of proof on the Reinstatement Petition and denied and dismissed the Reinstatement Petition. (*Id.*; WCJ's Decision, Conclusion of Law (COL) ¶ 2.) Because the WCJ "found that Employer did not intend to accept Claimant's diagnosis as work related through the payment of E-time," the WCJ also concluded Claimant did not meet his burden of proof on the Penalty Petition based on the cessation of E-time payments and denied and dismissed the same. (FOF ¶ 16; COL ¶ 3.)

### C. The Board's Opinion

Claimant appealed to the Board, arguing that the WCJ erred in denying the Petitions because the findings of fact were not supported by substantial evidence and his conclusion was contrary to precedent. The Board disagreed that the WCJ committed any legal error or abuse of discretion and affirmed. The Board held the credited and competent evidence, namely the testimony of Mr. Scott and Lieutenant Lowenthal, supported the WCJ's findings that the E-time payments were not made in lieu of compensation and, therefore, did not prevent Employer from denying liability for any alleged work-related injury related to Claimant's COVID. (Board's Opinion (Op.) at 7-8.) To the extent Claimant asserted he had given notice of the work relatedness of his COVID, the Board observed that this would not normally be a part of his burden of proof on a Reinstatement Petition, but it was here because he had not previously established the compensability of the injury. On this point, the Board observed that Claimant acknowledged that he had not advised Sergeant Dayton or any other supervisor that he had contracted COVID at work, stating "No, not in those words," and Sergeant Dayton's testimony that he did not recall Claimant

9

asking him to complete a COPA-II. (*Id.* at 9-10.) Additionally, the Board found no support for Claimant's position in the NCD, which identified an alleged injury and notice date, but denied liability for that injury based on it not being work related. (*Id.* at 11-12.) Finally, the Board held Claimant could not establish a violation of the Act in the absence of a finding that the E-time payments were wages in lieu of compensation that Employer had unilaterally terminated. (*Id.* at 13-14.) Accordingly, the Board affirmed the denial of the Petitions.

Claimant now petitions for review.[8]

## II. DISCUSSION

### A. Reinstatement Petition

Claimant argues the E-time payments were made in lieu of compensation for his work-related COVID, Employer's payment thereof was an admission of liability, and those payments estop Employer from denying liability under the Act. Claimant maintains that Mr. Scott was neither credible nor legally competent to provide testimony about Employer's intent for the payment of E-time for his COVID-related absences, and that the text messages established that he gave timely notice to Sergeant Dayton that his COVID was work related. His argument is further supported, Claimant asserts, by the facts that Employer did not place him on Act 17 benefits and that there was no official requirement to use the COPA-II until July 2022. According to Claimant, the decisions of the WCJ and the Board are inconsistent with precedent and the humanitarian purposes of the Act.

---

[8] This Court's scope of review in WC appeals "is limited to determining whether necessary findings of fact are supported by substantial evidence, whether an error of law was committed, or whether constitutional rights were violated." *Elberson v. Workers' Comp. Appeal Bd. (Elwyn, Inc.)*, 936 A.2d 1195, 1198 n.2 (Pa. Cmwlth. 2007).

Employer argues that its witnesses credibly established that the use of E-time to pay Claimant was not intended to supplant WC payments, and Claimant is asking this Court to reverse the WCJ's credibility determinations, which are for the WCJ, not the appellate court. Because the credited and competent evidence supports the finding that Employer did not intend the E-time payments to be wages in lieu of compensation, Employer maintains the underlying administrative decisions are consistent with precedent and, therefore, must be affirmed. Employer further asserts that while Claimant may have notified Employer of having COVID, the WCJ did not find that Claimant gave timely notice that his COVID was work related, which is also supported by substantial evidence, including Claimant's testimony that he did not report his COVID as being work related or request IOD benefits through the filing of a COPA-II. Finally, Employer asserts the WCJ did not ignore the humanitarian purpose of the Act but simply applied the law to the credited facts and found in Employer's favor.

Claimant filed a Reinstatement Petition on the premise that Employer initially made payments in lieu of compensation and then improperly stopped those payments, which he seeks to have reinstated. It is well settled that if an employer makes payments to an employee in lieu of compensation, and fails to file a timely NCD, the employer is estopped from denying compensability of the claim. *Kelly v. Workmen's Comp. Appeal Bd. (DePalma Roofing)*, 669 A.2d 1023, 1026-27 (Pa. Cmwlth. 1995). "Payments in lieu of compensation are any voluntary or informal compensation, apart from the Act, paid with the intent to compensate for a work-related injury." *Id.* at 1026. This is because an employer's act in making voluntary wage continuation payment is considered an admission of liability, similar to the admission an employer makes by filing a Notice of Compensation Payable. *Id.* at

11

1027. Where a claimant is totally disabled and the employer continues to pay the claimant, a rebuttable presumption arises that the disability is due to a work-related injury, or at least an inference that it is the employer's intent to treat the disability like a WC claim. *NUS Corp. v. Workmen's Comp. Appeal Bd. (Garrison)*, 547 A.2d 806, 809-10 (Pa. Cmwlth. 1988). Ultimately, however, it is the employer's or insurer's **intent** that governs whether payments are in lieu of compensation, not the receipt of such payments. *Kelly*, 669 A.2d at 1026. *See also Findlay Township v. Workers' Comp. Appeal Bd. (Phillis)*, 996 A.2d 1111, 1118 (Pa. Cmwlth. 2010) (holding that the critical inquiry is the insurer's intent for the payments). The claimant bears the burden of proving that the employer intended the payments to be in lieu of compensation and, therefore, an admission of liability that estops any future denial thereof. *NUS Corp.*, 547 A.2d at 809.

Claimant's arguments are predicated on his contention that the E-time payments were being paid as wages in lieu of compensation and in recognition of a work-related injury. However, the WCJ found otherwise based on the credited testimony of Mr. Scott and Lieutenant Lowenthal, as summarized in the WCJ's findings of fact, including that E-time payments were not implemented by the TPA and were paid to **any** employee, including Department and non-Department employees, who contracted COVID. This credited testimony constitutes substantial evidence[9] that supports the WCJ's finding that the E-time payments were not intended by Employer to be the payment of wages in lieu of compensation. While Claimant suggests that Mr. Scott's testimony was not credible, the WCJ is the ultimate fact finder, and the WCJ's authority over questions of witness credibility

---

[9] "Substantial evidence . . . [i]s such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Aqua Am., Inc. v. Workers' Comp. Appeal Bd. (Jeffers)*, 199 A.3d 482, 486 (Pa. Cmwlth. 2018).

and evidentiary weight is unquestioned and not subject to appellate review. *Jonathan Sheppard Stables v. Workers' Comp. Appeal Bd. (Wyatt)*, 739 A.2d 1084, 1088 (Pa. Cmwlth. 1999). "As the fact finder, the WCJ is entitled to accept or reject the testimony of any witness, including a medical witness, in whole or in part." *Id.* Those findings are not subject to appellate review unless they are made arbitrarily or capriciously. *City of Philadelphia v. Healey (Workers' Comp. Appeal Bd.)*, 297 A.3d 872, 882 n.13 (Pa. Cmwlth. 2023). Claimant does not assert that the WCJ's credibility findings were arbitrary or capricious, and we discern no evidence of such. *Id.*

Claimant does assert that Mr. Scott's testimony is not legally competent because he did not work for the Department. The legal competency of a witness is a question of law subject to appellate review. *Cramer v. Workmen's Comp. Appeal Bd. (Uni-Marts)*, 627 A.2d 231, 233 (Pa. Cmwlth. 1993). Mr. Scott offered testimony that was within his personal knowledge as to Employer's disability, injury, and E-time policies, and that the intent behind the last policy was so that an employee who was diagnosed with COVID, whether work related or not, would not be financially penalized thereby. Although Mr. Scott was not employed by the Department, he is Employer's Deputy Finance Director for Risk Management and Risk Manager and administers Employer's disability programs, including those for work-related injuries and illnesses. He also participated in discussions with the Department about COVID risks. This background gives him sufficient personal, first-hand knowledge on these topics to render his testimony competent. *Gibson v. Workers' Comp. Appeal Bd. (Armco Stainless & Alloy Prods.)*, 861 A.2d 938, 945, 948 (Pa. 2004) (holding that to be competent and admissible, a witness's testimony must be based on their first-hand knowledge); *Bristol Borough*

13

*v. Workers' Comp. Appeal Bd. (Burnett)*, 206 A.3d 585, 603 (Pa. Cmwlth. 2019) ("Personal knowledge may be established by the witness's own testimony.").

To the extent Claimant maintains that he notified Employer that his COVID was work related, making the E-time payments the payment of wages, the WCJ made no such finding. Notably, Claimant acknowledged that he had not advised Sergeant Dayton, or anyone, that his COVID was work` related "in those words," and Sergeant Dayton did not recall Claimant advising him that his COVID was work related. While Claimant asserts that his texts with Sergeant Dayton support a contrary conclusion, the WCJ chose not to draw that inference, and the fact that there may be evidence to support a different factual determination is of no moment. *W. Penn Allegheny Health Sys., Inc. v. Workers' Comp. Appeal Bd. (Cochenour)*, 251 A.3d 467, 475 (Pa. Cmwlth. 2021). And, contrary to Claimant's contention that Employer admitted in the NCD that it was notified of a December 21, 2020 work-related injury, the NCD reflected that Employer had been advised of Claimant's COVID diagnosis, but that Employer **denied** that such diagnosis was work related. (Reproduced Record at 318a.) Accordingly, this is not a basis to reverse the denial of the Reinstatement Petition.

*Mosgo v. Workmen's Compensation Appeal Board (Tri-Area Beverage, Inc.)*, 480 A.2d 1285 (Pa. Cmwlth. 1984), and *Kelly* do not require a different result. In *Mosgo*, the claimant sustained a heart attack while performing strenuous activity at work, his physician indicated that the heart attack was due to that strenuous activity, and the employer began making compensation payments based on its initial investigation, the physician's statement, and a statement by the claimant. 480 A.2d at 1286. The employer purported to reserve a right to deny benefits based on its additional investigation, did not issue a NCD at the time, and, eventually, unilaterally

14

stopped the payments and issued an NCD. *Id.* at 1286-87. We held the employer's reservation violated the Act,[10] and it was estopped from unilaterally ceasing payment of benefits based on its voluntary payment of compensation benefits and failure to issue a timely NCD. *Id.* at 1289-90. And in *Kelly*, the claimant was brutally attacked while performing work duties, and the employer visited him in the hospital and indicated his belief that he was responsible for the attack by another employee (whom the claimant had reprimanded in the past). 669 A.2d at 1024 & n.1. For six months after the attack, the employer paid the claimant's mortgage, paid his wife an additional amount of money, beginning two days after the attack and continuing for an unspecified period, and did not issue an NCD. *Id.* at 1025, 1027. As in *Mosgo*, we held that the employer's voluntary cash payments and failure to file a NCD was an admission of liability, and it was estopped from denying liability. *Id.* at 1027. In both of these cases the employer's intent for the payments, that they were made in lieu of compensation based on a work-related injury, was apparent from the circumstances. The same cannot be said here, where the E-time payments were made to **all** employees who were diagnosed with COVID, not just those whose COVID was claimed to be work related. Thus, *Mosgo* and *Kelly* do not require reversal.

Ultimately, in reviewing the WCJ's Decision, we "must view the evidence in the light most favorable to the prevailing party below, including the benefit of all inferences reasonably deduced from the evidence." *Lehigh Cnty. Vo-Tech Sch. v. Workmen's Comp. Appeal Bd. (Wolfe)*, 652 A.2d 797, 800 (Pa. 1995). Here, when

---

[10] *Mosgo* was decided prior to the Notice of Temporary Compensation Payable being added to the Act through which an employer could temporarily make payments for an alleged work-related injury while it continued to investigate that injury and could, with the filing of a Notice Stopping Temporary Compensation Payable, stop those payments if it later determined that the injury was not compensable.

15

the credited, competent evidence and the reasonable inferences deducible therefrom are viewed in the light most favorable to Employer, that evidence supports the WCJ's finding that Employer did not intend the E-time payments to be wages in lieu of compensation. This means that Claimant did not meet his burden of proof on the Reinstatement Petition, and there was no legal error or abuse of discretion in denying that petition.

### B. Penalty Petition

Claimant also argues the WCJ erred in denying the Penalty Petition because Employer had accepted liability for a work-related injury, and Employer violated the Act by unilaterally terminating the payments for his work-related injury. Claimant further asserts that Employer violated the Act by not issuing an official notice either accepting or denying the work-related claim within 21 days of Claimant advising Sergeant Dayton of his work-related illness via text. While Employer does not directly address these claims, its arguments that it did not accept any work-related injury, and that Claimant did not advise Employer of the work-relatedness of the injury can also apply to these claims.

To meet his burden of proof on the Penalty Petition, Claimant had to establish that Employer violated the Act or its regulations by ending his E-time payments. *See Shuster v. Workers' Comp. Appeal Bd. (Pa. Hum. Rels. Comm'n)*, 745 A.2d 1282, 1288 (Pa. Cmwlth. 2000). Because Claimant did not prevail on his arguments on the Reinstatement Petition, he also cannot prevail on his claims that Employer violated the Act and that the WCJ erred in denying the Penalty Petition.

16

### III. CONCLUSION

For the foregoing reasons, we discern no error or abuse of discretion in the denial of Claimant's Petitions and, therefore, affirm the Board's Order.

_____
**RENÉE COHN JUBELIRER**, President Judge

Judge Dumas did not participate in the decision in this case.

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Andre Clarke,                                          :
                Petitioner                 :
                                            :
                                            :
             v.                             :   No. 508 C.D. 2024
                                            :
City of Philadelphia (Workers'                         :
Compensation Appeal Board),                            :
             Respondent               :

# O R D E R

    **NOW**, January 17, 2025, the Order of the Workers' Compensation Appeal Board, entered in the above-captioned matter, is **AFFIRMED**.

_____
**RENÉE COHN JUBELIRER,** President Judge